424 So.2d 305 (1982)
Charlie W. JORDAN
v.
Raymond T. SUTTON, Commissioner of Conservation, State of Louisiana.
No. 82 CA 0162.
Court of Appeal of Louisiana, First Circuit.
November 16, 1982.
*306 Bobby L. Culpepper, Jonesboro, Hal R. Henderson, Arcadia, and Burton Paul Guidry, Stephen Edwards, Baton Rouge, for plaintiff-appellant Charlie W. Jordan.
Veil David Devillier, Eunice, for defendant-appellee Ray T. Sutton.
Robert T. Jorden, Kerry M. Massari, Paul B. David, Lafayette, for intervenor-appellee Southern Natural Gas Co.
Before LOTTINGER, COLE and CARTER, JJ.
CARTER, Judge.
This is an appeal from a judgment of the trial court in favor of defendant, Raymond T. Sutton, Commissioner of Conservation, State of Louisiana, and intervenor, Southern Natural Gas Company, (hereinafter referred to as SNG), and against plaintiff, Charlie W. Jordan, dismissing plaintiff's suit. The trial court found that plaintiff was guilty of unreasonable and inexcusable delay in filing suit, which delay prejudiced the defendant and intervenor, and therefore, the doctrine of laches was applicable.
The plaintiff appeals assigning as error the trial court's application of the doctrine of laches to this case and the trial court's findings of fact. This matter was previously on appeal and we concluded that the Administrative Procedure Act and LSA-R.S. 30:12 provided alternate and parallel forms of judicial review for persons aggrieved by orders of the Commissioner of Conservation and that the prescriptive period provided in the Administrative Procedure Act is not applicable to judicial review under LSA-R.S. 30:12. After granting a rehearing on the question of laches, the case was remanded for the taking of testimony from witnesses to be produced by plaintiff, defendant, and intervenor, for receipt of other evidence on the reasonableness of Jordan's delay, and for proof of prejudice to defendant or a third party. Jordan v. Sutton, 401 So.2d 389 (La.App. 1st Cir.1981).
On remand, the trial judge dismissed plaintiff's suit in its entirety finding that plaintiff was guilty of unreasonable delay in filing suit under LSA-R.S. 30:12 and that the Commissioner of Conversation and SNG were prejudiced by that delay. It is this decision that the plaintiff is now appealing.
*307 The doctrine of laches, sometimes referred to as equitable estoppel,[1] provides that a person, through his voluntary conduct, is barred and precluded, both at law and in equity, from asserting rights against another person who relies on such conduct. It arises when a person, by his acts, representations or admission, or even by his silence when it is his duty to speak, intentionally or through culpable negligence, induces another to believe that certain facts exist and the other person rightfully relies and acts upon his belief in those facts and will be prejudiced if the former is permitted to deny the existence or the truth of such facts. Since the application of laches to a particular case depends upon the facts and circumstances of that case, careful examination of time and sequence of events which ultimately led to plaintiff's suit will be made.
Following a harsh winter in 1976-1977, SNG began plans for an underground storage reservoir for natural gas piped in from various areas which would alleviate shortages previously experienced and insure to the consuming public a constant supply of natural gas during periods of great demand. Pursuant to this plan, SNG chose Reservoir A, Pettit Limestone Formation, of the Bear Creek Field in Bienville Parish, Louisiana, on the basis that this reservoir was substantially depleted and that it was in close proximity to SNG's pipelines. In April of 1977, SNG authorized $6,000,000.00 in expenditures for the storage project so that options from 75% of the owners in interest could be acquired as required under LSA-R.S. 30:22. This was necessary before SNG could apply to the Department of Conservation for an order establishing an underground natural gas storage reservoir.
Plaintiff Jordan is a landowner and mineral owner of properties in the Bear Creek Field who years earlier had executed a mineral lease to SNG. After receiving notice of SNG's application to the Commissioner of Conservation for a public hearing to establish the storage area, plaintiff had his attorney contact DeGolyer and MacNaughton, SNG's petroleum consultants, requesting information about condensate which remained in Reservoir A of the Pettit Limestone Formation.
The Commissioner of Conservation originally scheduled the public hearing for January of 1979, but at the request of plaintiff and some other landowners, the hearing was postponed until February 22, 1979. Prior to the hearing, plaintiff's attorney was successful in obtaining some information relating to the Pettit Limestone Formation.
At the February 22, 1979 hearing, plaintiff was present and represented by counsel, but his participation was limited to questions concerning the remaining condensate and royalty payments thereon. After the hearing, the Commissioner of Conservation issued Order No. 78-F-4 on April 20, 1979, (a copy of which is appended hereto as Appendix A) which authorized the creation of the underground storage area. Plaintiff was not convinced that the field was depleted of condensate and examined the Commissioner of Conservation's records and logs of wells in the Pettit Limestone Formation. The plaintiff, to his own satisfaction, confirmed his suspicions that the Pettit Limestone Formation consisted of two different strata completely void of natural porosity and permeability between the two, and that at least one of these strata continued to be capable of producing commercially recoverable hydrocarbons. Being so convinced, plaintiff had his attorney draft a letter to both the Commissioner of Conservation and SNG contending that SNG had presented fraudulent and misleading information to the Commissioner in order to obtain Order No. 78-F-4. Plaintiff suggested to the Commissioner that SNG be required to test the two separate zones by drilling a test well through the Pettit Limestone Formation in order to prove that SNG had not deceived the landowners and other owners in interest in the area. In March and April of 1979, plaintiff and his attorney had meetings with the Commissioner of Conservation and SNG concerning his *308 claims that there were two completely separate zones and recoverable condensate and other hydrocarbons in the Pettit Limestone Formation. At an April, 1979 meeting, SNG agreed to test the well being drilled in connection with the storage project, Well No. 1-3; however, SNG concedes that this well was never tested, but claims it was not tested because on April 24, 1979, plaintiff filed a $1.5 million dollar damage suit against SNG for its alleged drainage of his acreage.
On March 5, 1979, plaintiff filed a second suit against SNG and both suits were subsequently removed to Federal Court. Various attempts were made at compromise of these suits, but all were to no avail. Portions of the Federal suits were dismissed on May 30, 1980, and a final dismissal was granted May 26, 1981. SNG began exercising its options for the storage area in June 1979. Upon obtaining subleases or storage agreements from 75% of the owners in interest, the Commissioner of Conservation issued a supplement to Order No. 78-F-4 on July 3, 1979, which declared all of the provisions of the order fully effective.
In August of 1979, SNG commenced expropriation proceedings against all parties who were unwilling to voluntarily sign agreements. This included an expropriation proceeding against plaintiff which was tried in October of 1980. The record does not reflect the present status of that proceeding.[2] In January and February of 1980, plaintiff was in constant contact with the Commissioner or one of his staff expressing his suspicions that there was recoverable oil in a lower zone of the Pettit Limestone Formation.[3]
On February 21, 1980, plaintiff and other landowners met with the Commissioner of *309 Conservation and SNG. At this meeting, plaintiff presented his theories of two separate zones and of oil in the lower zone of the Pettit Limestone Formation. The possibility of a rehearing was discussed by the parties. From the February 21, 1980 meeting until the next meeting on May 12, 1980, plaintiff or his attorney contacted the Commissioner or his staff several times concerning plaintiff's claim of fraud.[4] On May 12, 1980, there was a meeting between the Commissioner, plaintiff and other landowners, SNG and their attorneys. At this meeting plaintiff requested a test of the Cummings # 1 well, but SNG agreed only to drill stem test two wells being drilled as injection-withdrawal wells for the storage reservoir (Nos. 1-6 and 6-1). SNG contends that they only agreed to test these wells to accommodate the plaintiff and to try to put his and other landowners' objections to rest. SNG contends that because of cement bond trouble on Well No. 1-6, it could not be tested. Only Well No. 6-1 was tested. The test performed on No. 6-1 revealed a bottom hole pressure of 1,388 lbs. On June 4, 1980, the Cummings No. 1 well inexplicably began flowing oil. SNG immediately shut the well off and posted 24-hr. guards on the well for approximately six months. Then, the guards were removed in November of 1980, and the well was plugged and abandoned.
On July 21, 1980, plaintiff filed the instant suit against the Commissioner of Conservation alleging that Order No. 78-F-4 was based on erroneous, false and misleading information; particularly on false, erroneous and misleading information supplied by SNG that the Pettit Limestone Formation, Reservoir A of the Bear Creek Field was a single reservoir and that the reservoir was depleted of oil capable of being produced in paying quantities. Among numerous allegations made by plaintiff, the more significant are the following: That the Pettit Limestone Formation consists of two different strata completely void of natural porosity and permeability between the two; that the lower Pettit zone was first tested by SNG on or about August 17, 1944 in the Cummings No. 1 well and that well has been produced by SNG from that zone and depth since first production without definition of proper allowable by the Commissioner of Conservation; and, that the Cummings # 1 well was capable of producing oil in paying quantities at the time this suit was filed and that the lower Pettit zone would produce oil in paying quantities in an area immediately south of the Cummings No. 1 well. The plaintiff further avers that the upper Pettit zone is productive of clear white distillate of an approximate gravity of 60 and the lower Pettit zone is productive of oil of a gravity of approximately 42, and that SNG had for many years been producing a combination of these hydrocarbons from the R.L. Jordan # 1 well (the well to the south of Cummings No. 1). Plaintiff also alleges that false Deliverability Test Reports were filed by SNG with the Commissioner of Conservation which failed to show production from dually perforated intervals until this was made known to the Commissioner by plaintiff. In essence, plaintiff contends that he has been "strung along" without being furnished needed information which is available from defendant and intervenor, and that such information will establish misrepresentations and other fraudulent activities on the part of SNG.
In the instant case, plaintiff sought the following: (1) A mandamus against the Commissioner of Conservation ordering and directing him to perform or cause to be performed such tests on the Cummings # 1 well as the court may direct to determine its capabilities for producing oil in paying quantities; (2) An order directing the Commissioner *310 to produce and allow inspection by plaintiff, his attorney, and his geologist, of all electric logs, porosity logs, drilling histories and work resume reports of all wells drilled in certain sections of the Pettit Limestone Formation; (3) Answers to certain interrogatories propounded to the Commissioner; (4) An order declaring null and void the Commissioner of Conservation's Order No. 78-F-4 creating an underground gas storage area in the Pettit Limestone Formation, Reservoir A, Bear Creek Field; (5) An injunction restraining the Commissioner of Conservation from issuing any orders in furtherance of the underground storage facility of SNG in the Pettit Limestone Formation.
On July 25, 1980, SNG intervened in the proceeding, joining with the Commissioner of Conservation in resisting plaintiff's demand.
The Commissioner of Conservation and SNG contend plaintiff was guilty of unreasonable delay in waiting 15 months following the issuance of Order No. 78-F-4 to file his law suit on July 21, 1980. It is argued that for the first nine months of this 15 month period, plaintiff failed to even contact the Commissioner regarding his objections to the order. In the remaining six months, numerous communications were had between the plaintiff, his attorneys, the Commissioner and SNG, but suit was not filed until July 21, 1980. The Commissioner and SNG argue that a reasonable excuse has not been asserted by the plaintiff for the further delay in filing suit after communicating his objections to the Commissioner of Conservation beginning in January of 1980. These parties assert that it was reasonable for them to assume and to rely upon their assumption, that plaintiff was not going to contest Order No. 78-F-4, since 15 months had passed without any proceeding being filed on behalf of plaintiff.
Stated succinctly, SNG contends that plaintiff delayed filing the instant suit, that SNG spent millions of dollars on the facilities, and that by this suit, plaintiff seeks to effect a beneficial remunerative compromise of worthless and unsupported claims. It is plaintiff's position that he has attempted to obtain his day in court through various suits, including the two suits filed in Bienville Parish, which were subsequently removed to Federal Court where they were dismissed, SNG's expropriation suit,[5] and finally the present action.
We have been cited no cases and are aware of none in which laches has been applied to judicial review of an order of the Commissioner of Conservation under LSA-R.S. 30:12. The concept of laches, however, has been applied to petitions seeking judicial review of orders of other administrative bodies and in other cases. See e.g. State v. Sewerage and Water Board, 179 La. 117, 153 So. 533 (1934).
In Triangle Oil Co. v. City of New Orleans, 5 So.2d 558, 561 (La.App.Orl.1942), the Court stated:
"In Corpus Juris, Vol. 21 Section 211 at page 210, is found the following:
`Laches in a general sense is the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. More specifically, it is inexcusable delay in asserting a right; an implied waiver arising from knowledge of existing conditions and an acquiescence in them; * * *; such delay in enforcing one's rights as works disadvantage to another.'
In constituting a defense, the doctrine of lack of vigilance is based on, and in part resides in, the injury which might be occasioned, the injustice that might result from the enforcement of long neglected rights, the difficulty and in many instances the impossibility, of ascertaining the truth of matters in controversy and doing justice between the parties, and in part on grounds of public policy, its aim being the discouragement, for the peace and repose of society, of stale and antiquated demands. It is equally well recognized, however, that the doctrine cannot be invoked *311 to defeat justice and will be applied only where the enforcement of the right asserted would work injustice.

There is no absolute rule as to what constitutes laches or staleness of demand, and each case must rest upon its own peculiar circumstances. It must be conceded that laches is not, like fixed periods of prescription, a mere matter of time. It resolves itself, rather, into principally a question of the inequity of permitting the claim to be enforced, an inequity which takes into consideration some intermediate change in conditions." (Emphasis by the Court).
Two elements must be proved by the defendant to establish that plaintiff was guilty of laches: (1) Unreasonable delay on the part of the plaintiff in filing suit; (2) Harm that would be suffered by the defendant or a third party resulting from defendant's or a third party's actions based on reasonable assumption, occasioned by the delay, that the plaintiff would not seek further legal redress. Jordan v. Sutton, supra.
In considering whether the first element of laches, namely whether unreasonable delay was established, it is necessary to determine when Order No. 78-F-4 became final. From the language of the order, it appears that it became final on April 20, 1979, to be followed by supplemental orders to carry it out. The pertinent language of Order No. 78-F-4 provides:
"1. The Pettit Limestone Formation Reservoir A, reference Definition No. 1 above, is hereby approved and adopted as an underground reservoir for the injection, storage and withdrawal of natural gas; and the total storage area, including the Pettit Limestone Formation, Reservoir A, and the necessary adjacent lands, is hereby established and designated as the Pettit Limestone Gas Storage Area,
. . .
2. Southern Natural Gas Company is hereby designated as Operator and as the party exclusively authorized to use said Pettit Limestone Gas Storage Area for the purposes herein set forth, ..."[6] (Emphasis by the Court)
The doctrine of laches will be discussed as to each item of relief sought by plaintiff in his petition of July 21, 1980.
The primary items of relief requested in plaintiff's petition seek to have declared null and void Order No. 78-F-4 of the Commissioner of Conservation and any supplemental orders which might thereafter issue concerning the storage facility in the Pettit Limestone Formation and seek injunctive relief in connection therewith.
The efficiency of the operations of administrative agencies and the effectiveness of administrative decisions require prompt judicial review of administrative orders. The Commissioner of Conservation testified that a lengthy delay in the finality of his orders would cause uncertainty in the oil industry in the State of Louisiana and would in turn cause drilling in the state to come to a halt. He emphasized that such a delay would cause his office to be in chaos. In addition to this uncertainty, he further testified that there would be instability in recovery of the state's natural resources and serious prejudice to mineral owners, lessors, lessees, and all persons in the oil industry if his orders are allowed to be challenged months after their issuance.
SNG contends that it would be prejudiced if Order No. 78-F-4 could be attacked months after its issuance. Concerning the storage facility involved in this case, during the 15 months between the issuance of the order and the subsequent suit by plaintiff, SNG and its partners entered into complicated business transactions and made large expenditures to develop the storage facility in reliance upon the validity of the Commissioner's order. Expropriation proceedings have been filed and in some cases reduced to judgment.[7] Rights have been acquired. Pipelines have been built and the entire facility has been constructed and is in operation. $97,859,149.00 had been expended *312 as of the date that this suit was filed, and presently, $163,977,211.00 has been expended on construction of the facility. Numerous members of the consuming public that are in need of the natural gas in storage in times of severe weather conditions would also be prejudiced. The very nature and operation of the oil and gas industry requires that the orders of the Commissioner be challenged without delay.
In short, the two elements necessary for defendant to establish that plaintiff was guilty of laches concerning finality of the order of the Commissioner, namely unreasonable delay in filing a direct suit against the Commissioner and harm that would be suffered by defendant and SNG resulting from their actions occasioned by the delay, are clearly present, and the trial judge correctly so held.
Therefore, for the above reasons, we find that the doctrine of laches does apply to bar those items of relief of plaintiff's suit attacking the finality of Order No. 78-F-4 and seeking to enjoin the issuance of any supplemental order in connection therewith. We agree with the holding of the trial court in this respect.
Although we have held that the order is final and unassailable as to the establishing of the underground storage facility, and its use, operation, and service, we find merit in the appellant's argument that the other items of relief are not barred by laches. The doors of the courts of this state will not lightly be closed against a litigant's day in court. Laches can never be invoked to defeat justice. 30A C.J.S. § 115, p. 42; Triangle Oil Co. v. City of New Orleans, supra. As stated in Shirey v. Campbell, 151 So.2d 557 (La.App. 2d Cir.1963), at page 560:
"... It is equally well recognized, however, that the doctrine cannot be invoked to defeat justice and will be applied only where the enforcement of the right asserted would work injustice.
`There is no absolute rule as to what constitutes laches or staleness of demand, and each case must rest upon its own peculiar circumstances ...'"
Plaintiff's seeking of an order directing that tests be performed on the Cummings # 1 well to determine its capabilities for producing hydrocarbons in paying quantities is not barred by laches. The trial court's action in applying the doctrine of laches to this portion of the suit is in error. Contrary to assertions by the Commissioner and SNG that plaintiff was silent for nine months after the order became final, plaintiff has sought productivity information of the Cummings # 1 well since he received notice of the hearings to establish the proposed storage facility. Throughout all his suits (including the Federal Court suits) and the negotiations involved therewith, plaintiff has contended that commercially recoverable condensates and/or other hydrocarbons still exist in the Cummings # 1 well and in areas adjacent thereto for which he should receive royalty payments. All of the plaintiff's requests to test Cummings # 1 well were refused by SNG, even requests for tests plaintiff offered to perform at his own expense. Finally, SNG agreed to test well No. 1-3, but such tests were not performed. According to the testimony of Mr. Bledsoe, employee of SNG, this test was not performed because of the damage suit filed by plaintiff against SNG. This excuse is not plausible, because a proper testing of this well with results favorable to SNG and adverse to plaintiff would most likely, at that time, have put all of plaintiff's claims to rest. Thus, it cannot be said that plaintiff sat idly by without asserting his rights, and by so doing caused the Commissioner of Conservation and SNG to detrimentally rely on the Order. From day one, plaintiff has been attempting, without success, to obtain productivity information concerning Cummings No. 1 well. Even if unreasonable and inexcusable delay were found on the part of plaintiff in regard to this portion of this suit, we can see no prejudice whatsoever that could result to the Commissioner of Conservation. If SNG is prejudiced because the results of these tests substantiate plaintiff's claims, the prejudice suffered will be a result of their own activities and *313 not the result of any delay by plaintiff. Therefore, even if the first element of laches should be found, the second element, namely prejudice to the defendant or a third party caused by the delay, is clearly not present.
Plaintiff also contends as the next item of relief, that an order should be issued directing the Commissioner of Conservation to produce and allow plaintiff to inspect all electric logs, porosity logs, drilling histories and work resume reports of wells in the Pettit Limestone Formation compiled since February 22, 1979. Plaintiff seeks this information in order to attempt to verify his theory that Pettit Limestone Formation is two separate and distinct reservoirs, rather than one interconnected reservoir, as SNG presented to the Commissioner of Conservation in the February 22, 1979 hearing. This information would also be relevant in establishing plaintiff's theory of commercially recoverable hydrocarbons remaining in the lower zone of the Pettit Limestone Formation. From the beginning, the obtaining of pertinent information has been a main objective and the right to the information has been asserted by Jordan since the first notice of plans for a storage reservoir. At the public hearing, at the meetings between the parties thereafter, and during virtually every communication between plaintiff and the Commissioner and SNG, plaintiff has requested relevant testing information or has discussed his theories of commercially recoverable hydrocarbons and the existence of two separate zones, and has requested information which would prove (or disprove) his theories. Therefore, we cannot in the name of equity say that plaintiff's claims for testing information is barred by laches, when the circumstances of the case show that both the Commissioner of Conservation and SNG were aware, long prior to the filing of this suit, that plaintiff actively sought this information.
We do not believe that it will work an injustice to allow plaintiff to proceed with a trial on the merits on this portion of his claim. Both the Commissioner of Conservation and SNG have been aware from the outset of plaintiff's desire to be supplied with the requested information in order to prove the existence of the claims. The Commissioner of Conservation and SNG, for reasons best known to themselves, have consistently refused to obtain and supply this information.
As stated in Shirey v. Campbell, supra, at page 562:
"It was further observed that a party setting up an estoppel must have acted in reliance upon the conduct or representations of the parties sought to be estopped, and that, as a general rule, it was essential that he should not only have been destitute of knowledge of the real facts as to the subject matter of the controversy, but should have also been without convenient or ready means of acquiring such knowledge. See also, Harvey v. Richard, supra, and the authority therein cited."[8]
Neither the Commissioner of Conservation nor SNG can seriously contend that they were without knowledge of the subject matter of this portion of the litigation. Both had the information or had convenient or ready means of acquiring such information. The Commissioner testified as follows:
"Q. Mr. Sutton, are the same witnesses available to you now that would have been available had Mr. Jordan filed his suit ten days after 78F4?
A. I can't think of one that would be different.
Q. All right. And would the same evidence that you could gather today be available to you as would have been available had Mr. Jordan filed his suit ten days after your order was issued?
A. The information we have now I don't think is any different at that time."
*314 From the above, it is clear that the doctrine of laches is not applicable to this portion of plaintiff's suit, and the trial court clearly erred in holding it applicable.
Another portion of plaintiff's suit to which the trial court applied the doctrine of laches was the order that the Commissioner be required to answer interrogatories. For the reasons set forth in the prior discussion, this request cannot be barred by laches since these interrogatories request the same type of information the plaintiff had been requesting from the outset. The Commissioner cannot be prejudiced by having to now answer interrogatories concerning information which plaintiff has been requesting since January of 1979. Additionally, it would appear that most of the information requested in these interrogatories only involves a study of the present records and tests in the possession of the Commissioner. We are not called upon in this proceeding to decide the relevancy or appropriateness of particular interrogatories and are only holding that the doctrine of laches as applied to this portion of plaintiff's suit by the trial court is clearly erroneous.[9]
Therefore, for the above reasons, the decision of the trial court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion. All costs shall await final determination of the matter.
REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.
APPENDIX A
OFFICE OF CONSERVATION, STATE OF LA. TO SOUTHERN NATURAL GAS CO.
 STATE OF LOUISIANA REGISTRY
 OFFICE OF CONSERVATION NUMBER Y-5850
 BATON ROUGE, LOUISIANA
 April 20, 1979
 ORDER NO. 78-F-4 
Order concerning creation of an underground gas storage area and for regulations covering the injection, storage and withdrawal of natural gas in and from the same, all relating to the Pettit Limestone Formation, Reservoir A, in the BEAR CREEK FIELD, Bienville Parish, Louisiana.

* * *
Pursuant to power delegated under the laws of the State of Louisiana, and particularly Title 30 of Louisiana Revised Statutes of 1950, and after a public hearing originally scheduled for January 18, 1979, and then continued to and held under Docket No. 79-36 in Shreveport, Louisiana, on February 22, 1979, upon the application of Southern Natural Gas Company, following legal publication of notice and notice to all known interested parties by posting and publishing in accordance with rules prescribed by the Commissioner of Conservation, *315 the following order is issued and promulgated by the Commissioner of Conservation as being reasonably necessary to conserve the natural resources of the State, to prevent waste as defined by law, to avoid the drilling of unnecessary wells, and otherwise to carry out the provisions of the laws of this State.

DEFINITIONS
(1) The Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, is hereby defined as being that certain geological stratum or formation occurring in the Bear Creek Field, Bienville Parish, Louisiana, and encountered between a depth of 6,968 feet and a depth of 7,080 feet as shown on the electric log on the Southern Natural Gas Company Hodge-Hunt Well No. D-1 located in Section 7, Township 16 North, Range 5 West, Bienville Parish, Louisiana.
(2) The Pettit Limestone Gas Storage Area is hereby defined as comprising all of the Pettit Limestone Formation, Reservoir A, reference Definition No. 1 above, together with such adjacent lands as are necessary to be included in the storage area for the protection of the storage reservoir, all as shown on the plat labeled "Southern Natural Gas Company Exhibit No. 7 for Docket No. 79-36", attached hereto.

FINDINGS
The Commissioner of Conservation finds as follows:
1. That the Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, is a closed reservoir productive of only gas and condensate, and that it is effectively separated from any other reservoir.
2. That the Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, is suitable for the injection, storage and withdrawal of natural gas.
3. That the use of the Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, for the injection, storage and withdrawal of natural gas is reasonably necessary to promote conservation of natural gas, to prevent waste, to insure more uniform withdrawal of natural gas from various gas fields, and to make natural gas more readily available to the consumer, all of which are in the public interest and have a public purpose.
That a reasonable interpretation of the geological and engineering data indicates that the Pettit Limestone Gas Storage Area outlined on the plat labeled "Southern Natural Gas Company Exhibit No. 7 for Docket No. 79-36", attached hereto, comprises the entirety of the Pettit Limestone Formation, Reservoir A, and such adjacent land as is reasonably necessary to encompass and protect the gas storage reservoir.
5. That a reasonable interpretation of the same geological and engineering data establishes that the Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, is not fully depleted, but that said reservoir, as of November 1, 1978, had a remaining commercially recoverable reserve of only 1,744.6 MMCF of natural gas, and 13,089 barrels of condensate at 60° Fahrenheit and 15.025 psia; said remaining recoverable reserves being divided among the producing units as follows:

 Gac
 (MMCF) Condensate
Unit @ 15.025 (bbl.) 
P SUA J. H. Poole Unit 7.2 0
P SUB Commercial Real Estate 1 391.8 3.927
P SUD T. J. Cummings Unit 1 0.0 0
P SUE Federal Land Bank 1 36.8 148
P SUF Hodge-Hunt A-1 203.0 1,334
P SUH Hodge-Hunt D-1 142.3 0
P SUI R. L. Jordan 1 194.6 1,404
P SUJ T. A. Loe 1 580.9 4,505
P SUK F. E. McGee 1-D 188.0 1,771

6. That while it has been determined, based on all of the available evidence, that the commercially recoverable condensate is as shown in Finding No. 5 above, it is recognized that as a result of the storage operation additional condensate (more than the 13,089 barrels) may be obtained. If this occurs, a portion of the total of such additional condensate (said portion being based on the lease royalty interest applicable as of *316 the effective date of this order) should be allocated to each tract within the productive limits of the Pettit Limestone Formation, Reservoir A, as shown on "Southern Natural Gas Company Exhibit No. 7 for Docket No. 79-36", on a surface-acre basis, and the proceeds from the sale of such portion of additional condensate should be paid to the owners of said tract, their successors or assigns.
7. That the Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, has greater value or utility for the storage of natural gas than for the production of the remaining volumes of original natural gas and condensate, and that more than threefourths of the owners in interest, exclusive of any lessor as defined in R.S. 41:1261 of the Louisiana Revised Statutes of 1950, have consented in writing to the use of said reservoir for the underground storage of natural gas by the execution of options to acquire storage agreements or subleases covering the Pettit Limestone Formation, Reservoir A.
8. That the use of the Pettit Limestone Formation, Reservoir A, in the Bear Creek Field, for the storage of natural gas will not contaminate other formations containing fresh water, oil, gas or other commercial mineral deposits.
9. That the methods proposed by the applicant for remedial work on existing wells that have penetrated the Pettit Reservoir, and for the drilling of new wells to the Pettit Limestone Formation, Reservoir A, in connection with the injection, storage and withdrawal of natural gas and water disposal associated with the operation of the gas storage reservoir are reasonable and adequate, and these operations and the proposed storage should not endanger lives or property.
10. That reasonable regulations should be established for drilling into and through the Pettit Limestone Formation, Reservoir A.

ORDER
NOW, THEREFORE, IT IS ORDERED THAT:
1. The Pettit Limestone Formation, Reservoir A, reference Definition No. 1 above, is hereby approved and adopted as an underground reservoir for the injection, storage and withdrawal of natural gas; and the total storage area, including the Pettit Limestone Formation, Reservoir A, and the necessary adjacent lands, is hereby established and designated as the Pettit Limestone Gas Storage Area, as shown on the plat labeled "Southern Natural Gas Company Exhibit No. 7 for Docket No. 79-36", attached hereto and made a part hereof.
*317 
*318 2. Southern Natural Gas Company is hereby designated as Operator and as the party exclusively authorized to use said Pettit Limestone Gas Storage Area for the purposes herein set forth, with such exclusive right also being vested in the successors and assigns of said corporation.
3. All natural gas which previously had been reduced to possession and which subsequently is injected into such storage area shall at all times be deemed the property of applicant, its successors and assigns; and in no event shall such gas be subject to the right of the owner of the surface of the lands or of any mineral, mineral royalty or mineral leasehold interest therein under which such underground storage reservoir lies or is adjacent to, or of any person other than applicant, its successors and assigns, to produce, take, reduce to possession, waste or otherwise interfere with or exercise any control thereover.
4. The applicant is hereby authorized to rework such wells and to drill such additional wells as may be necessary in connection with the operation of the storage project, all without further orders of the Commissioner; but this order is issued subject to the right of the Commissioner to issue such further orders, rules and regulations or to call hearings for the issuance of such orders, rules and regulations as may be necessary for the purpose of protecting the storage area herein established and authorized against pollution, drainage or the escape of natural gas therefrom, including such necessary rules and regulations as may pertain to the drilling into or through the storage area.
5. The casing program for wells drilled into the storage area shall be in accordance with the provisions of Statewide Order No. 29-B effective August 1, 1943, and any amendments and revisions thereof, except that Subparagraph 1 of Paragraph E of Section V shall not apply.
6. Within the gas storage area, for any well drilled (1) to the Cotton Valley Formation or to objectives where the abnormally high pore pressures are encountered and recognized in the Bear Creek Field, an intermediate casing string shall be set through the Pettit to a depth that will provide protection from the abnormally high pore pressures or (2) for wells drilled through the Pettit Limestone Formation but not penetrating said high pressure zone, appropriate cementing procedures shall be used for all such wells so that cement shall be placed in the annular space behind the production or intermediate casing, as the case may be, to cover the Pettit Formation to a point 200 feet above and below such formation. The cement bond through the Pettit Limestone Formation shall be evaluated by running a cement bond log survey. If the log survey does not indicate an effective seal, a remedial block squeeze shall be made and evaluated by another cement bond log survey, and this procedure shall be continued until an effective seal has been accomplished. For wells not penetrating said high pressure zone and in the event casing is not run through the Pettit Formation, appropriate procedures shall be used so as to place a cement plug across the Pettit Formation and such plug shall extend 200 feet below and 200 feet above the Pettit Formation. The storage field Operator shall be notified in sufficient time to witness any such cementing procedure and running of cement bond logs and shall be furnished copies of casing and cementing records.
7. The Operator of the gas storage area herein established shall comply with the provisions of Finding No. 6 above.
8. On or before March 1, 1980, the applicant shall file with the Commissioner of Conservation evidence that it has exercised its options to acquire subleases or storage agreements from at least three-fourths of the owners in interest; and upon the furnishing of such evidence, a supplemental order shall be issued, without the necessity of a formal hearing, recognizing that such options have been exercised, and that this order is fully effective.
9. The drilling units created for the Pettit Limestone Formation by the 78-F Series of Office of Conservation Orders shall continue in force and effect until such time as the *319 applicant shall furnish the Commissioner of Conservation evidence that operation of the storage project has commenced, and thereupon, a supplemental order shall be issued, without a formal hearing, declaring that the 78-F Series of Orders and the units created thereby for the Pettit Limestone Formation are null and void and of no further force and effect.
 This Order shall be effective on and after
February 22, 1979.
 OFFICE OF CONSERVATION
 OF THE STATE OF LOUISIANA
 /s/ R.T. Sutton
 R.T. SUTTON
 COMMISSIONER OF CONSERVATION
Southern Natural Gas
Company Exhibit No. 7
for Docket No. 79-36
attached.
NOTES
[1] Shirey v. Campbell, 151 So.2d 557 (La.App. 2d Cir.1963).
[2] See Southern Natural Gas Co. v. Poland, 406 So.2d 657 (La.App. 2d Cir.1981). SNG's expropriation proceeding against Charlie W. Jordan was included in these ten consolidated cases. In this proceeding, our brethren of the 2nd Circuit stated, at page 665:

"We reiterate that for expropriation of an underground reservoir for natural gas storage, the statute requires only that the petitioner show express approval of the Commissioner, good faith negotiation, and the public and necessary purpose of the expropriation. Whether or not the reservoir is capable of producing oil and in paying quantities, whether or not three-fourths of the owners in interest have agreed to the reservoir being used for the storage of natural gas, whether or not the reservoir is suitable and feasible for the storage of natural gas, and all other determinations set forth in LRS 30:22B which are required to be made by the Commissioner, are matters to be contested before the Commissioner or in an action against the Commissioner, and are not before the court in an expropriation action. The proffered evidence could be weighed and construed by the Commissioner or by a court having jurisdiction to negate a Commissioner's order, as grounds to modify or reverse the Commissioner's approval of the use of the reservoir for the storage of natural gas. But neither the lower court nor this court has authority to modify or reverse the Commissioner's order approving this reservoir for the storage of natural gas on any evidence, including that of fraud, as is alleged by defendants.4 Assignment 12 presents no error. (Footnote omitted)"
See Also Footnote 2 in the above cited case, at page 661, which states as follows:
"Defendant in our docket no. 14,671, Charlie W. Jordan, has questioned the validity of the Commissioner's Order in an action against the Commissioner in East Baton Rouge Parish. That action is yet pending. See Jordan v. Sutton, 401 So.2d 389 (La.App. 1st Cir.1981). Jordan is represented in that action by the same counsel in this appeal and some of the issues raised are raised here."
The record is not clear as to whether this judgment is final. See Shepards, 406 So.2d 657US Appeal Pending.
[3] After a settlement negotiation meeting between plaintiff and SNG on January 24, 1980, which proved to be unsuccessful, plaintiff began to make numerous telephone calls to the Commissioner of Conservation expressing his concerns about the storage order. On January 31, 1980, February 13, 1980, February 15, 1980, and February 20, 1980, plaintiff placed telephone calls to the Office of the Commissioner of Conservation. Plaintiff was successful in reaching the Commissioner on the first two days, and discussed with him his suspicions that there are two separate zones in the Pettit Formation and commercially recoverable hydrocarbons in the lower of these two zones. Plaintiff also informed the Commissioner of his belief that SNG had supplied fraudulent and misleading information to the Commissioner at the February 22, 1979 hearing in order to obtain the storage order. The plaintiff was not able to speak to either the Commissioner or one of his staff in the last two telephone calls.
[4] Between the February 21, 1980 meeting and the May 12, 1980 meeting, plaintiff or his attorney communicated with the Commissioner or his office on a weekly basis. The plaintiff called and spoke to the Commissioner or one of his staff members on February 25, 1980, March 18, 1980, and April 30, 1980. Testimony revealed that the main topic of these conversations was plaintiff's allegations of fraud against SNG in obtaining the order. Letters were also written on behalf of plaintiff's cause by plaintiff's attorney on March 27, 1980 and April 9, 1980.
[5] See Footnote 2.
[6] See Appendix A appended hereto.
[7] See Footnote 2.
[8] Harvey v. Richard, 200 La. 97, 7 So.2d 674 (1942).
[9] Anticipating contentions that this decision establishing the finality of the order of the Commissioner makes moot the remaining portions of plaintiff's suit, this court feels compelled to set forth the following: This is not a decision on the merits of any claim by plaintiff or defendant or intervenor. The finality of the Order of the Commissioner is herein established and intervenor will not have its facility destroyed and demolished to the prejudice of the Commissioner, the intervenor, or the hundreds of persons needing supplies of natural gas. The oil industry will not be put in chaosorderly development of the state's natural resources can continue unabated and without adverse effect. After a trial on the merits, the Commissioner can be required to furnish, or can require SNG to furnish, necessary information to the plaintiff for the plaintiff to establish whether the now final order was properly issued based on proper evidence or was issued on false information and through fraudulent actions of SNG.